**2013 UT App 205**

# THE UTAH COURT OF APPEALS

WASHINGTON COUNTY SCHOOL DISTRICT AND UTAH SCHOOL
BOARD RISK MANAGEMENT ASSOCIATION,
Petitioners,
*v.*
LABOR COMMISSION AND STEVEN H. BROWN,
Respondents.

Opinion
No. 20110228-CA
Filed August 22, 2013

Original Proceeding in this Court

Bret A. Gardner and Kristy L. Bertelsen,
Attorneys for Petitioners
Aaron J. Prisbrey and Elizabeth B. Grimshaw,
Attorneys for Respondent Steven H. Brown
Alan L. Hennebold, Attorney for Respondent
Labor Commission

JUDGE CAROLYN B. MCHUGH authored this Opinion, in which
JUDGES JAMES Z. DAVIS and STEPHEN L. ROTH concurred.

McHUGH, Judge:

¶1     The Washington County School District and the Utah School
Board Risk Management Association (collectively, the School
District) seek judicial review of the final order of the Labor
Commission (the Commission) awarding Steven H. Brown
additional workers' compensation benefits. We decline to disturb
the Commission's decision.

BACKGROUND

¶2     On January 27, 2003, while employed as a bus driver for the
School District, Mr. Brown fell off the steps of a school bus. He

injured his lower back and was treated by Dr. Dale Stott for left-sided low-back and leg pain. Dr. Stott initially attempted to manage Mr. Brown's pain by administering lumbar epidural steroid injections on May 12, 2003, June 12, 2003, July 22, 2003, May 12, 2004, and August 3, 2004; a nerve block on October 8, 2003; and lumbar paravertebral facet nerve radiofrequency destruction on November 4, 2003, and May 19, 2004.[1] Despite these treatments, Mr. Brown continued to experience back pain. As a result, Dr. Stott referred him to a spine surgeon, Dr. Mark Kabins.

¶3    On August 20, 2004, Dr. Kabins concluded that an MRI of Mr. Brown's spine "demonstrates a large extruded disc herniation at the L4–5[2] with sequestration."[3] Dr. Kabins performed surgery to repair the left side of Mr. Brown's lumbar spine at the L4–5 level on August 29, 2004. Dr. Kabins's notes from an October 1, 2004

---

1. Radiofrequency destruction or radiofrequency ablation "is a procedure used to reduce pain. An electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specific area." *See Radiofrequency Ablation for Arthritis Pain*, WebMD, http://www.webmd.com/pain-management/radiofrequency-ablation (last visited Aug. 16, 2013).

2. "The vertebrae . . . are organized into segments, starting at the top of the spinal cord, and within each segment they are numbered. . . . The lumbar area (between the chest area and the pelvis) contains 5 lumbar vertebrae (L1 through L5) . . . ." *See Living with a Spinal Cord Injury—What Happens*, WebMD (Feb. 16, 2011), http://www.webmd.com/brain/tc/living-with-a-spinal-cord-injury-what-happens.

3. "A disc herniation occurs when the soft cushion between the spinal bone ruptures. . . . A disc sequestration occurs when the center, gelatinous portion of the disc is not only squeezed out, but also separated from the main part of the disc." Jonathan Cluett, *Disc Extrusion, Protrusion, and Sequestration*, About.com (Oct. 10, 2005), http://orthopedics.about.com/od/herniateddisc/g/discs.htm.

postoperative examination indicate that Mr. Brown "does have intermittent back discomfort, but is clearly improved and stable." Dr. Kabins prescribed pain medication and scheduled a final follow-up visit to see Mr. Brown a month later. However, Mr. Brown returned to Dr. Kabins on October 16, 2004, and reported that he "was doing well until 4 days ago when he developed onset of back discomfort." Dr. Kabins prescribed Mr. Brown additional pain medication to address his "increased back pain and . . . discomfort in his left leg." Three weeks later, Dr. Kabins reported that Mr. Brown was "doing well with minimal discomfort."

¶4      Mr. Brown sought workers' compensation benefits for his 2003 workplace injury. The School District accepted liability for the injury and paid him permanent partial disability compensation as well as medical benefits. At that time, the Commission rated him with a 10% whole person impairment and approved his receipt of workers' compensation benefits. In October 2004, Mr. Brown returned to work driving a school bus for the School District.

¶5      On March 8, 2007, Mr. Brown again saw Dr. Stott and reported that he was experiencing "low back pain and left leg pain and numbness," which "ha[d] existed for 2 years." Mr. Brown indicated to Dr. Stott that he did well for about one year after the 2004 surgery, but then the pain returned, and he now suffered from it daily. Dr. Stott diagnosed Mr. Brown with "Failed Back Surgery Syndrome" and "Probable recurrent disc herniation." Dr. Stott also ordered an MRI, which was performed on March 22, 2007. The MRI confirmed that Mr. Brown had an L4–5 recurrent disc extrusion[4] slightly indenting the thecal sac[5] and mildly compromising both

---

4. "A disc extrusion occurs when the outer part of the spinal disc ruptures, allowing the inner, gelatinous part of the disc to squeeze out." *Id*.

5. The thecal sac surrounds the spinal cord and is filled with cerebral spinal fluid. *See Thecal sac*, Wikipedia, http://en.wikipedia .org/wiki/Thecal_sac (last visited Aug. 16, 2013).

the lateral recesses[6] and the right neuroforamen.[7] The radiology report from the MRI also indicated some right side involvement, stating, "L4–5 demonstrates right posterolateral[8] prominence of the disc without enhancement compatible with a broad disc extrusion slightly indenting the thecal sac. This mildly compromises both lateral recesses and the right neuroforamen." To treat the pain caused by this condition, Dr. Stott administered another lumbar epidural steroid injection on April 9, 2007. Dr. Stott's procedure report described the preinjection diagnosis as "Failed Back Surgery Syndrome" and "Lumbar radiculopathy,"[9] and the postinjection diagnosis as "SAME."

¶6     Five months later, on September 1, 2007, Mr. Brown was attending a local festival when a person called out his name and

---

6. "The lateral recess is the space within the spinal canal located toward the sides." Anne Asher, *Lateral Recess*, About.com (June 22, 2011), http://backandneck.about.com/od/anatomyexplained/g/Lateral-Recess.htm.

7. The neuroforamen is an opening between vertebrae that allows for the passage of the nerves from the spinal cord to other parts of the body. *See Intervertebral foramina*, Wikipedia, http://en.wikipedia.org/wiki/Intervertebral_foramina (last visited Aug. 16, 2013).

8. Posterolateral is defined as "[b]ehind and to one side, specifically to the outer side." *See Posterolateral*, Drugs.com, http://www.drugs.com/dict/posterolateral.html (last visited Aug. 16, 2013).

9. Lumbar radiculopathy is "one clinical name for pain that radiates from a nerve root in the lumbar spine down into your legs . . . ." *Lumbar Radiculopathy—Symptoms, Causes, and Treatments*, LumbarSpinalStenosis.com, http://www.lumbarspinalstenosis.com/lumbar-radiculopathy-symptoms-causes-treatments-low-back-leg-pain.html (last visited Aug. 16, 2013).

then jumped on his back, forcibly knocking Mr. Brown to the ground. Although Mr. Brown did not see the person, based on his long experience as a bus driver he assumed it was a child he drove on the School District's bus who was excited to see him. Mr. Brown felt immediate back pain, and following the festival incident, he suffered from constant stabbing, burning pain in his lumbar area that radiated from his back all the way down his legs.

¶7      Dr. Stott examined Mr. Brown on September 19, 2007, and reported that

> Steven Brown is a 38 year-old male receiving treatment at Zion Pain Management for low back pain and right lower extremity pain. Today he presents with the new right sided symptoms. In the past, his symptoms were left sided, but he[] reports these have resolved. Steven has received the following interventional pain management procedures since his last office visit: lumbar transforaminal epidural steroid injection x 2. He reports 100 percent improvement from this procedure. In last 3 weeks has started to radiate to right buttock and right lower extremity into right 2,3,4 toes of right foot with numbness and tingling. He states this happened after someone jumped on him and he fell. He states the pain is constant.

Dr. Stott again diagnosed Mr. Brown with "Failed Back Surgery Syndrome" and "Lumbar radiculopathy." Dr. Stott also ordered a new MRI.

¶8      Dr. Stott's notes of a subsequent visit on October 2, 2007, state that the second MRI showed "[n]ew disc sequestration extending cranially behind the L4 Veterbral body with moderate right lateral recess compromise and indentation of the thecal sack." The radiology report further indicates that "this disc extrusion demonstrates a component which extends left posterolaterally as well at L4–5." Dr. Stott determined that Mr. Brown's injuries had

progressed since his previous examination and assessed Mr. Brown with "Failed Back Surgery Syndrome," "Lumbar radiculopathy," and "Lumbar Disc Extrusion L4–5."

¶9     On October 6, 2007, Mr. Brown consulted with Dr. Kabins, whose notes reflect that since Mr. Brown was last seen on November 5, 2004, he has "undergone maintenance care by Zion Pain Management" and "has had low back pain, left lower extremity radiculopathy." Dr. Kabins further indicated that Mr. Brown "underwent microdecompressive surgery.[10] He had an excellent outcome. He has subsequently undergone injection therapy . . . on a supportive basis." According to Dr. Kabins, Mr. Brown reported that around September 1, 2007, "he ha[d] developed worsening low back pain and worsening right lower extremity radicular symptoms. He relays an event where he was jumped by a young family boy. He fell to the ground, landed on his buttock and developed . . . right lower extremity radiculopathy." Dr. Kabins concluded, "Certainly it appears that the causality for the herniated disc is multi factorial, that being a preexisting process in the industrial injury, as well as an acute process from the recent attack/incident." Based on his examination, Dr. Kabins advised Mr. Brown that surgery was reasonable and appropriate.

¶10     On October 25, 2007, Mr. Brown consulted with Dr. Gary Snook, who diagnosed him with "Intervertebral disc disorder with myelopathy, lumbar region."[11] Dr. Snook also noted that the MRI

---

10. Microdecompressive surgery "is a minimally invasive surgical procedure in which a portion of a herniated [disc] is removed by way of a surgical instrument or laser." *Spinal decompression*, Wikipedia, http://en.wikipedia.org/wiki/Spinal_decompression (last visited Aug. 16, 2013).

11. Myelopathy is defined as "any functional disturbance and/or pathological change in the spinal cord." *Myelopathy*, TheFreeDictionary.com, http://medical-dictionary.thefreedictionary.com/myelopathy (last visited Aug. 16, 2013).

of the lumbar spine showed "HNP at L4–5 right sided."[12] At a follow-up visit on October 31, 2007, Dr. Snook reported, "The event which precipitated this [lower back] pain was a young child jumped on his back[]. He states that the current episode of pain started Sept. 1 2007 . . . ." Dr. Snook performed spinal surgery on Mr. Brown on November 1 and 5, 2007. Dr. Snook also completed a Treating Physician Opinion report on November 20, 2007, which answers "yes" to the question, "Is there a medical causal relationship between the industrial exposure and the problems for which you have been treating the employee . . . ?" Dr. Snook continued to treat Mr. Brown through December 2007.

¶11 After the 2007 incident, Mr. Brown petitioned the Commission for payment of additional medical expenses, other recommended medical care, and additional temporary total disability compensation. In response, the School District filed an answer denying workers' compensation liability for Mr. Brown's new injuries on the ground that there was no medical causation between the 2003 workplace injuries and the 2007 injuries.

¶12 At the request of the School District, Dr. Richard Knoebel examined Mr. Brown on March 18, 2008. Dr. Knoebel prepared a report in which he notes,

> Given the MRI scan findings of right-sided disc extrusion with right neural foraminal narrowing remaining, as well as significant degenerative disc disease and disc desiccation at that level noted in MRI scan prior to 9/1/07, it must be said with a reasonable degree of medical probability that "the initial work-related accident (is merely) a contributing cause of the subsequent injury."

---

12. HNP is an abbreviation for herniation of the nucleus pulposus, commonly known as a herniated disc. *See* Edgar G. Dawson, *Herniated Discs: Definition, Progression, and Diagnosis*, SpineUniverse, http://www.spineuniverse.com/conditions/herni ated-disc/herniated-discs-definition-progression-diagnosis (last visited Aug. 16, 2013).

Although Dr. Knoebel concluded that Mr. Brown "had a permanent aggravation of his pre-existing L4–5 industrial condition secondary to the non-industrial incident of [2007]," he explained that his conclusion was based on the assumption that this court's decision in *McKesson Corp. v. Labor Commission*, 2002 UT App 10, 41 P.3d 468, "dictates that the previous work related accident has to be 'merely' some contributing cause of the subsequent injury." Dr. Knoebel further opined that the prior workplace injury "certainly was not the most important or significant cause" of the subsequent injury but was "a very minor contributing cause."

¶13    A month after he prepared his initial report, Dr. Knoebel had a conversation with the School District's legal counsel. Shortly thereafter, Dr. Knoebel wrote a supplemental report opining that "the subsequent non-industrial low back aggravation . . . was not the 'natural result' of the prior industrial event." The supplemental report further notes, "Not all people with a prior surgical discectomy at L4–5 go on to have a re-rupture as a natural result of the original injury and surgery. In this case the significant cause for the recurrent disc herniation at L4–5 was the non-industrial permanent aggravation of [2007]."

¶14    At a hearing before an Administrative Law Judge (ALJ) on May 6, 2008, Mr. Brown gave sworn testimony that he "never recovered from the January 27, 2003 accident and was always stiff and sore and would have [flare] ups that required pain medication."[13] In addition, he introduced his medical records as evidence. Those records included the opinions of Dr. Snook, Dr. Kabins, and Dr. Knoebel.[14] On August 27, 2008, the ALJ issued her written decision, concluding, "All medical evidence supports a finding that the prior industrial disc injury was a contributing

---

13. Those prescriptions were paid for by workers' compensation from the date of the initial injury to 2007.

14. Dr. Stott, who treated Mr. Brown after both incidents, did not provide an opinion as to the impact of the 2003 workplace accident on the injuries Mr. Brown suffered in 2007.

cause to the outcome and injury resulting from the festival incident . . . ." In particular, the ALJ determined that Mr. Brown's "disc at the L4–5 level with its 'residual' disc extrusion and 'already narrowing' right neural fragment was a contributing cause to the injury." The ALJ additionally ruled that because there was "no evidence that Mr. Brown was engaged in any rash or foolhardy conduct" or other intentional or negligent misconduct, "there was no break in the chain of causation between his original work accident and his injury after the September 2007 incident." Accordingly, the ALJ ordered the School District to pay Mr. Brown for reasonable and necessary medical expenses and temporary total disability compensation.

¶15    In response, the School District filed a motion for review, claiming that Dr. Knoebel's supplemental report established that the injuries sustained after the 2003 industrial accident were not the medical cause of Mr. Brown's injuries. The School District further argued that Dr. Knoebel's supplemental report created a conflicting medical opinion regarding medical causation and that the ALJ should have appointed a medical panel to resolve the issue. The Commission agreed with the ALJ that the 2003 accident was a contributing cause of Mr. Brown's 2007 injuries. In doing so, the Commission also found that there were no conflicting medical opinions. Accordingly, the Commission affirmed the ALJ's decision and awarded Mr. Brown additional workers' compensation benefits. The School District now petitions this court for review of the Commission's decision.


ISSUES AND STANDARDS OF REVIEW

¶16    The School District first argues that the Commission applied the wrong medical causation analysis in determining Mr. Brown's eligibility for additional workers' compensation benefits. Whether "the Commission relied upon an incorrect legal standard in determining [a petitioner's] eligibility for additional workers' compensation benefits . . . presents a question of law, which we review for correctness." *McKesson Corp. v. Labor Comm'n*, 2002 UT App 10, ¶ 10, 41 P.3d 468. However, an issue is generally not

properly presented for judicial review unless it has been preserved in the administrative proceedings. *See Brown & Root Indus. Serv. v. Industrial Comm'n*, 947 P.2d 671, 677 (Utah 1997).

¶17    The School District also challenges the Commission's factual findings. "To aid the appellate court in conducting a whole record review, the party challenging the factual findings must marshal all of the evidence and demonstrate that, despite the facts supporting the decision, the 'findings are not supported by substantial evidence.'" *Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 36, 164 P.3d 384 (quoting *Grace Drilling Co. v. Board of Review of Indus. Comm'n*, 776 P.2d 63, 68 (Utah Ct. App. 1989)).

¶18    Next, the School District contends that the ALJ erred in refusing to refer the case to a medical panel to determine whether the 2003 accident was the medical cause of Mr. Brown's 2007 injuries and whether the 2007 injuries were the natural result of the 2003 workplace accident. Although Utah's Workers' Compensation Act (the Act), *see* Utah Code Ann. §§ 34A-2-101 to -1005 (LexisNexis 2011 & Supp. 2012), generally affords the ALJ discretion whether to convene a medical panel in workers' compensation cases, *see id.* § 34A-2-601(1)(b) (2011), the regulations implementing the Act require the ALJ to use a medical panel when "one or more significant medical issues may be involved," *see* Utah Admin. Code R602-2-2.A. The Administrative Code further provides that conflicting medical reports generally constitute a significant medical issue. *Id.* "Whether there are conflicting medical reports is a question of fact," the Commission's findings on which "[w]e must uphold . . . if such findings are supported by substantial evidence based upon the record as a whole." *Brown & Root*, 947 P.2d at 677.

¶19    Last, the School District argues that the Commission misapplied section 34A-2-401 of the Act by concluding that Mr. Brown's 2003 industrial accident was the cause of his 2007 injuries. In particular, the School District challenges the Commission's application of the governing legal standard to the facts of this case. Thus, the School District's argument presents "a

traditional mixed question of law and fact." *See Murray v. Labor Comm'n*, 2013 UT 38, ¶ 24. "The standard of review we apply when reviewing a mixed question can be either deferential or nondeferential . . . ." *Id*. ¶ 36. We will defer to an agency determination of a mixed question when "'the mixed finding is not "law-like" because it does not lend itself to consistent resolution by a uniform body of appellate precedent' or 'is "fact-like" because the trial court is in a superior position to decide it.'" *Id*. ¶ 37 (emphasis omitted) (quoting *In re Adoption of Baby B.*, 2012 UT 35, ¶ 42). In *Murray*, the Utah Supreme Court held that the Commission's decision that a claimant had failed to establish legal causation under the Act was law-like and, therefore, subject to nondeferential review. *Id*. ¶ 40. Accordingly, we uphold the Commission's findings of fact if they are supported by substantial evidence. *Martinez*, 2007 UT 42, ¶ 17. But we review the Commission's application of the law to the facts for correctness. *See Murray*, 2013 UT 38, ¶¶ 33, 40.


ANALYSIS

I. The School District Failed To Preserve Its Argument That the Commission Should Have Applied a Different Medical Causation Analysis.

¶20     The School District argues that the Commission applied the wrong legal standard in determining medical causation. To put this issue in context, we begin our analysis with an overview of the law governing causation under the Act.

¶21     Section 34A-2-401(1) of the Act provides that an employee "who is injured . . . by accident arising out of and in the course of the employee's employment, wherever such injury occurred, if the accident was not purposely self-inflicted, shall be paid . . . compensation for loss sustained on account of the injury," including medical expenses. Utah Code Ann. § 34A-2-401(1) (LexisNexis 2011). Here, there is no dispute that Mr. Brown had a workplace accident in 2003. The parties are also in agreement that Mr. Brown's 2007 injuries were not self-inflicted. Thus, the issue in

dispute is whether Mr. Brown's 2007 injuries arose "out of and in the course of [Mr. Brown's] employment." *See id.*

¶22    In *Mountain States Casing Services v. McKean*, 706 P.2d 601 (Utah 1985) (per curiam), the Utah Supreme Court considered whether an injury arose out of and in the course of employment even though it occurred after the initial workplace accident. *Id*. at 601–03. There, an employee lost his right arm in an industrial accident and it was surgically reattached. *Id*. at 601–02. The employee's doctor advised him that the sensation in his right hand would return gradually and instructed him to use the hand as much as possible to increase mobility. *Id*. at 602. After spending a day repairing a steam radiator in his home, installing an exhaust header in his car, and cooking a meal on a hot plate, the employee awoke the following morning with second degree burns on his right hand. *Id*. The employer and its insurer denied liability for the medical expenses related to the burn on the grounds that it was "unrelated to the original [workplace] accident and [the employee] was negligent in not protecting his hand from burns." *Id.* On review, the Utah Supreme Court affirmed the Industrial Commission's order requiring the employer to pay for the employee's medical expenses, stating, "Once a compensable injury occurs, there is no limitation as to the time during which all medical[ expenses] resulting from that injury will continue to be paid." *Id*. at 601–02. The supreme court further explained,

> A subsequent injury is compensable if it is found to be a natural result of a compensable primary injury. [The employee] is not required to show that his original tragedy was the sole cause of a subsequent injury, but only that the initial work-related accident was a contributing cause of his subsequent . . . injury.

*Id*. at 602.

¶23    One year after *McKean*, the Utah Supreme Court again interpreted the Act in *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986). There, an employee with a history of back problems suffered a herniated disc while lifting a crate at work. *Id*. at 17. The

ALJ found that the injury did not arise out of or in the course of employment and denied compensation. *Id*. On review, the Utah Supreme Court explained that to recover under the Act, the employee must prove "a causal connection between the injury and the worker's employment duties." *Id*. at 22. The supreme court further explained that the employee must prove that the workplace accident is both the legal and the medical cause of the injuries. *Id*. at 25–27. For medical causation, the supreme court adopted the test advanced by a legal commentator, Professor Arthur Larson, which distinguishes between situations in which the employee had a medical condition before the workplace injury and those where the employee did not, noting,

> "If there is some personal causal contribution in the form of a [preexisting condition], the employment contribution must take the form of an exertion greater than that of nonemployment life . . . .
>
> If there is no personal causal contribution, that is, if there is no prior weakness or disease, any exertion connected with the employment and causally connected with the [injury] as a matter of medical fact is adequate to satisfy the legal test of causation."

*Id.* at 26 (alterations in original) (quoting Larson, *Workmen's Compensation* § 38.83(b), at 7-278 (1986)).

¶24      More recently, in *McKesson Corp. v. Labor Commission*, 2002 UT App 10, 41 P.3d 468, this court considered whether the *Allen* causation analysis had supplanted the *McKean* natural result standard when determining whether a claimant qualifies for additional benefits due to a subsequent aggravation of a compensable workplace injury. *Id*. ¶¶ 12–23. The employer in *McKesson* asserted that the compensable primary injury created a preexisting condition that placed the burden on the employee under *Allen* to show an extraordinary workplace exertion before he was eligible to recover for subsequent aggravation of those injuries. *Id*. ¶ 19. Relying in part on *McKean*'s treatment of subsequent compensable injuries, *id.* ¶¶ 18, 21, we held that "it would be

inappropriate to examine subsequent aggravations of compensable work-related injuries by applying the same exacting standard that we apply when determining the compensability of primary workplace injuries involving preexisting conditions," *id.* ¶ 22. Instead, we concluded that once the initial injury is determined to be a compensable injury, "the employer is responsible for 'all medical[ costs] resulting from [the compensable] injury,' including costs resulting from subsequent aggravations to the compensable workplace injury." *Id.* ¶ 21 (alterations in original) (quoting *McKean*, 706 P.2d at 602). The *McKesson* court then qualified that statement, noting, "Of course, responsibility for costs resulting from subsequent aggravations to compensable workplace injuries is not automatic. The claimant must first demonstrate that the subsequent aggravation is the 'natural result' of the primary workplace injury or accident." *Id*. ¶ 21 n.3 (quoting *McKean*, 706 P.2d at 602); *see also Champion Home Builders v. Industrial Comm'n*, 703 P.2d 306, 307 (Utah 1985); *Perchelli v. Industrial Comm'n*, 475 P.2d 835, 837 (Utah 1970).

¶25    In the present case, the ALJ and the Commission applied the natural result test announced in *McKean* to determine whether Mr. Brown's 2007 injuries are compensable. The School District argues on appeal that because the subsequent injury involved an outside force rather than Mr. Brown's own conduct, the Commission should have applied the causation standard mandated by *Allen*. Mr. Brown contends that the School District failed to preserve this issue in the administrative proceedings. In response, the School District points to its Answer to Application for Hearing and pretrial disclosures filed before the Commission as having preserved this issue. In particular, the School District relies on its assertion that Mr. Brown "cannot establish, on a more probable than not basis, that there is medically demonstrative causal connection between [Mr. Brown's] current complaints of back pain and any industrial event sustained . . . while employed by [the School District]."

¶26    We agree with Mr. Brown that this statement is insufficient to bring to the attention of the ALJ or the Commission that the School District sought the application of the *Allen* causation

standard rather than the *McKean* natural result standard. There is nothing in the record to indicate that the School District ever made a specific objection to the ALJ's application of the *McKean* causation standard. *See State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 ("Where there is no clear or specific objection and the specific ground for objection is not clear from the context[,] the theory cannot be raised on appeal." (alteration in original) (citation and internal quotation marks omitted)). Furthermore, while the language upon which the School District relies in its written submissions challenges Mr. Brown's ability to prove causation by a preponderance of the evidence, it says nothing about the causation test itself. Under these circumstances, the argument that the *Allen* test should apply is not preserved and we do not address it on the merits. *See Brown & Root Indus. Serv. v. Industrial Comm'n*, 947 P.2d 671, 677 (Utah 1997) (holding that issues not raised in administrative proceedings are not subject to judicial review, absent exceptional circumstances).[15]

## II. Because the School District Failed to Adequately Marshal the Evidence, We Do Not Disturb the Factual Findings.

¶27    The School District also attempts to challenge the ALJ's and Commission's findings of fact. However, the School District has failed to marshal the evidence. To challenge a finding of fact, "a party may not simply cite to the evidence which supports his or her position and hope to prevail. Rather, a party should construct the evidence supporting the adversary's position, and then ferret out a fatal flaw in the evidence." *Utah Cnty. v. Butler*, 2008 UT 12, ¶ 11, 179 P.3d 775 (citations and internal quotation marks omitted). By setting forth only the facts that are helpful to its position and ignoring those that support the factual findings, the School District has turned the marshaling requirement on its head. For example, the School District's statement of the facts emphasizes that Mr. Brown had presented "*with new right sided symptoms*" after the 2007 incident, that the MRI scan conducted after the 2007 incident "revealed that [Mr. Brown] had sustained a *new* L4–5 *right*

---

15. The School District does not assert that there are any exceptional circumstances in the present case that would warrant appellate review of an unpreserved issue.

posterolateral disc injury," and that "Dr. Stott confirmed that [Mr. Brown] had sustained a *new disk herniation* at L4–5." (Emphases added.) However, the MRI scan performed on March 22, 2007, prior to the incident with the child, showed that Mr. Brown's "recurrent disc extrusion slightly indenting the thecal sac and mildly compromising *both* lateral recess *and the right neuroforamen*." (Emphases added.) In direct contravention of the obligation to set forth the evidence in favor of the Commission's factual findings, the School District never mentions the existence of this MRI, which shows the condition of Mr. Brown's spine only five months before the festival incident. Because the School District has not adequately marshaled the evidence, we decline to disturb the factual findings of the Commission. *See id.*

### III. The ALJ Was Not Required To Submit the Question of Medical Causation to a Medical Panel.

¶28   Next, the School District claims that the ALJ erred by not submitting the issue of medical causation to a medical panel. The Utah Administrative Code requires the ALJ to refer an issue to a medical panel when there are conflicting medical opinions relating to causation of the injury. Utah Admin. Code R602-2-2.A. According to the School District, Dr. Knoebel disagreed with Dr. Kabins's and Dr. Snook's conclusions that the 2003 workplace accident was a contributing cause of Mr. Brown's 2007 injuries. To resolve this issue, we must consider whether there is substantial evidence to support the ALJ's finding that there was no dispute among the physicians based on the record as a whole. *See Brown & Root*, 947 P.2d at 677 ("Whether there are conflicting medical reports is a question of fact. We must uphold the Commission's factual findings if such findings are supported by substantial evidence based upon the record as a whole.").

¶29 Substantial evidence in the record supports the Commission's finding that there was no conflict among the medical experts relating to the cause of Mr. Brown's 2007 injuries. Dr. Snook opined that there was a medical causal relationship between Mr. Brown's 2003 work-related injuries and his 2007 injuries. Likewise, Dr. Kabins opined that there were multiple

factors that caused the herniated disc, including both the 2003 accident and the 2007 incident. Consistent with these opinions, Dr. Knoebel's original report states that residual damage to the L4–5 area of the spine, including the right-sided disc extrusion apparent in the MRI taken before the 2007 incident, "is considered, with a reasonable degree of medical probability, a contributing cause" of Mr. Brown's new injuries. Dr. Knoebel further states that Mr. Brown "had a permanent *aggravation* of his *pre-existing L4–5 industrial condition secondary to the non-industrial incident of* [2007]." (Emphases added.)

¶30    In the supplemental report Dr. Knoebel filed after consulting with the School District's attorney, he also reported that Mr. Brown's "subsequent . . . low back aggravation . . . was not the 'natural result' of [his work-related injury]." The Commission noted, however, that Dr. Knoebel "qualified the meaning of 'natural result' by explaining that not all people who undergo a discectomy on one side experience another rupture as a result of the injury or surgery." Neither the ALJ nor the Commission was required to consider Dr. Knoebel's attempts to opine on legal causation. Instead, they could properly limit their consideration of his report to the medical findings, including that the 2003 accident was a "contributing cause" of Mr. Brown's 2007 injuries. *See Intermountain Health Care, Inc. v. Board of Review of the Indus. Comm'n*, 839 P.2d 841, 845 (Utah Ct. App. 1992) (explaining that an ALJ, not a medical panel, is to determine legal causation). Because there is substantial evidence in the record to support the Commission's finding that Dr. Knoebel did not disagree with the other physicians with respect to medical causation, the ALJ was not required to refer that question to a medical panel.

IV. The Commission Correctly Determined that Mr. Brown's 2007 Injuries Were a Natural Result of the 2003 Workplace Accident.

¶31    The School District further contends that even if the natural result standard of causation is applicable and a medical panel was not required, "there is insufficient medical evidence to establish that the right sided L4–5 disk herniation [Mr. Brown] sustained

from the non-industrial September 1, 2007 accident is the 'direct and natural result' of the January 27, 2003 industrial accident." The School District offers two main arguments in support of that contention: (A) that the leap of a third party onto Mr. Brown's back was an "independent intervening cause" of his 2007 injuries and (B) that Mr. Brown was required to prove that the 2003 workplace accident was more than 50% responsible for the 2007 injuries. We address each argument in turn.

A.      The Third Party's Independent Act Did Not Negate the Causal Connection Between the 2003 Workplace Accident and the 2007 Injuries.

¶32     Relying on tort causation concepts, the School District asserts that the leap onto Mr. Brown's back was an independent, intervening cause that broke the chain of causation between the 2003 workplace accident and Mr. Brown's 2007 injuries. However, workers' compensation is a statutory remedy and not a tort action. Our objective in construing the Act is to give effect to the Utah Legislature's intent. *Savage v. Utah Youth Vill.*, 2004 UT 102, ¶ 18, 104 P.3d 1242. "To discern legislative intent, we look first to the statute's plain language," and we read that language "as a whole[] and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (alteration in original) (citations and internal quotation marks omitted). Furthermore, we interpret the Act consistently with its purpose of "simplif[ying] the process of awarding compensation for industrial accidents, thereby helping injured workers receive benefits and employers avoid tort lawsuits." *Reinsurance Fund v. Labor Comm'n*, 2012 UT 76, ¶ 14, 289 P.3d 572. And we construe the Act "liberally in favor of finding employee coverage." *Id.* (citation and internal quotation marks omitted).

¶33     The Act provides that an employee "who is injured . . . by accident arising out of and in the course of the employee's employment . . . shall be paid" certain benefits and expenses. Utah Code Ann. § 34A-2-401(1) (LexisNexis 2011). In addition, the definition of terms section of the Act states, "'Personal injury by

accident arising out of and in the course of employment' includes an injury caused by the willful act of a third person directed against an employee because of the employee's employment." *Id*. § 34A-2-102(j)(i). The Act further provides,

> When any injury or death for which compensation is payable under this chapter or Chapter 3, Utah Occupational Disease Act is *caused by the wrongful act or neglect of a person other than an employer*, officer, agent, or employee of the employer: (a) *the injured employee . . . may claim compensation*; and (b) the injured employee . . . may have an action for damages against the third person.

*Id*. § 34A-2-106(1) (emphases added). Thus, the Act expressly contemplates that employees may recover compensation for injuries inflicted by the negligence of third parties and injuries caused by the willful acts of third parties under some circumstances.

¶34     Here, Mr. Brown testified that he assumed the person who jumped on his back was one of the School District's students who recognized Mr. Brown as his bus driver, raising the possibility that the 2007 injuries are recoverable directly as a "'[p]ersonal injury by accident arising out of and in the course of employment.'" *Id*. § 34A-2-102(j)(i). However, because the Commission's factual recitation indicates that an "unknown person" jumped on Mr. Brown's back, it did not find that the third party was, in fact, one of Mr. Brown's students who jumped on him "because of [his] employment." *See id*. Nevertheless, the express language of the Act confirms that the right to workers' compensation is not coextensive with tort principles.

¶35     Indeed, we have previously declined to utilize tort causation concepts in applying the statutory scheme provided by the workers' compensation system, stating,

> [A] "proximate cause" analysis, as that term is commonly used, is not appropriate in workers'

compensation cases. Proximate cause is used primarily in tort law and involves analysis of foreseeability, negligence and intervening causes. These factors are not present in the statutory workers' compensation system, which excludes consideration of fault.

*Large v. Industrial Comm'n*, 758 P.2d 954, 956 (Utah Ct. App. 1988) (citing A. Larson, 1 *Workmen's Compensation Law* § 6.60 (1985)). Therefore, although the unexpected leap by a third party onto Mr. Brown's back might affect whether causation has been met, the relevant causation standard is whether the 2007 injuries were a natural result of the 2003 workplace accident. *See Mountain States Casing Servs. v. McKean*, 706 P.2d 601, 602 (Utah 1985) (per curiam).

¶36　According to the School District, Dr. Knoebel's opinion indicates that the 2007 injuries were not the natural result of the 2003 workplace accident because they *would* have resulted even in the absence of the prior industrial accident. Contrary to the School District's characterization, Dr. Knoebel did not opine that the "subsequent non-industrial medical condition would have more probably than not occurred even without the primary industrial event." Dr. Knoebel said only that the 2007 incident *could* have occurred even if Mr. Brown had not suffered the prior industrial injuries to his lumbar spine.[16] We consider Dr. Knoebel's choice of verb significant. By indicating that the 2007 injuries could have been caused even if Mr. Brown had not suffered the 2003 industrial

---

16. Dr. Knoebel's report states,

> By the description of the [2007] incident, however, this, in and of itself, *could* have caused the same right-sided L4–5 disc extrusion with onset of right leg radiculopathy, to a reasonable degree of medical probability, absent the previous L4–5 disc injury. Nonetheless, [Mr. Brown] does have the history of a pre-existing surgery with associated disc degeneration at that level on an industrial basis.

(Emphasis added.)

accident, Dr. Knoebel simply indicated that it was possible. Furthermore, we agree with the Commission that "there is no evidence that Mr. Brown *would* have suffered his current low-back injury regardless of his work-related injury in 2003." Indeed, even Dr. Knoebel acknowledges that the 2007 injuries are at the same level of the spine as was impacted in the 2003 industrial accident and that the MRI of Mr. Brown's lumbar spine taken before the 2007 festival incident revealed right-sided abnormalities. Consequently, nothing about Dr. Knoebel's opinions negates the causal connection between the 2007 injuries and the 2003 industrial accident. To the contrary, Dr. Knoebel acknowledged that the 2003 accident was a contributing cause, albeit a minor one.

B.      The Preponderance of the Evidence Standard Does Not Require the Workplace Accident To Be More than 50% of the Cause of the Subsequent Injury.

¶37     The School District next contends that medical causation between injuries sustained in an initial work-related accident and subsequent injuries must be established "by a preponderance of the evidence." We agree. *See Allen v. Industrial Comm'n*, 729 P.2d 15, 23 (Utah 1986) ("[T]he standard to prove causal connection is [by a] preponderance of the evidence."); *Large*, 758 P.2d at 956 (same). The School District further argues that the requirement that "the causal connection between the two accidents be supported by at least a preponderance of evidence" means that the workplace accident must constitute "more than 50%" of the cause of the subsequent injury. However, the School District confuses the facts required to prove causation with the standard by which those facts must be established.

¶38     The Utah Legislature knew how to expressly limit recovery to injuries caused more than 50% by the workplace accident if that had been its intent. *See LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (stating that legislative intent is derived from the plain language of the statute read in harmony "with other statutes in the same chapter and related chapters" (citation and internal quotation marks omitted)). Similar to the Act, the Utah Occupational Disease Act provides for compensation when a disease "arises out of and

in the course of employment and is medically caused or aggravated by that employment." *See* Utah Code Ann. § 34A-3-103 (LexisNexis 2011). With respect to "[p]hysical, mental, or emotional diseases related to mental stress arising out of and in the course of employment," the Utah Occupational Disease Act expressly limits legal causation to instances in which "extraordinary mental stress aris[es] predominantly and directly from employment." *Id.* § 34A-3-106(1)–(2)(a). By using the word "predominantly," the legislature evidenced an intent that compensation be available for these stress-induced workplace diseases only when "the sum of all work related stress is greater than the sum of all non-work related stress." *Eastern Utah Broad. v. Labor Comm'n*, 2007 UT App 99, ¶ 9, 158 P.3d 1115.

¶39　Unlike the Utah Occupational Disease Act, nothing in the Workers' Compensation Act expressly limits compensation to injuries predominantly caused by the workplace accident. The absence of such a limitation provides some evidence that the legislature did not intend to restrict recovery to instances where the workplace accident constitutes over 50% of the cause of the subsequent injuries. *Cf. Envirocare of Utah, Inc. v. Tax Comm'n*, 2009 UT 1, ¶ 6, 201 P.3d 982 (relying on the fact that "[t]he legislature clearly knew how to identify items that could be excluded from the tax base" as evidence of intent not to exclude the item in question); *State Farm Mut. Auto. Ins. Co. v. Clyde*, 920 P.2d 1183, 1187 (Utah 1996) (concluding that where the legislature used the term "in loco parentis" in unrelated statutes but omitted such language in the relevant statute, that omission indicated an "intentional rejection of the concept of de facto parent or guardian in this context").

¶40　Furthermore, in Utah, unlike the other jurisdictions referenced by the School District, our supreme court has instructed that the "natural result" standard does not require an employee "to show that his original tragedy was the sole cause of a subsequent injury, but only that the initial work-related accident was a contributing cause of his subsequent . . . injury." *Mountain States Casing Servs. v. McKean*, 706 P.2d 601, 602 (Utah 1985) (per curiam); *accord McKesson Corp. v. Labor Comm'n*, 2002 UT App 10, ¶ 18, 41 P.3d 468. This precedent is inconsistent with the School District's

argument that Utah's natural result test requires that the workplace accident constitute over 50% of the cause of the subsequent injuries.

¶41     Nor do we agree with the School District that a contributing cause test is too broad because "the employer will become the lifetime insurer of all subsequent non-industrial injuries." We considered a similar argument in *Intermountain Health Care, Inc. v. Board of Review of the Industrial Commission*, 839 P.2d 841 (Utah Ct. App. 1992). There, an employee injured her back in an industrial accident that resulted in her missing several months of work and eventually being awarded temporary total disability benefits. *Id.* at 842. Subsequently, the employee experienced a sudden, sharp pain in her back when she attempted to lift her four-month-old grandchild. *Id.* at 842–43. The employee underwent disc fusion surgery and applied for additional disability benefits. *Id.* at 843. The ALJ asked a medical panel to determine whether there was a "medically demonstrable causal connection" between the baby-lifting incident and the prior industrial accident. *Id.* The panel reported that the back surgery was 70% caused by the workplace injury and 30% caused by lifting the baby. *Id.* The ALJ then awarded the employee benefits, and the Commission affirmed that decision. *Id.*

¶42     On appeal, the employer claimed that the question to the panel of whether there was a "medically demonstrable causal connection" between the two events "adopted a substantially more liberal standard for causation than that adopted by the Utah Supreme Court." *Id.* at 844. According to the employer, the ALJ should have asked the panel whether the disc fusion surgery was the direct and natural result of the prior industrial accident. *Id.* As in this case, the employer claimed that the ALJ's question "would impose responsibility on an employer upon a finding of even the slightest relationship between the industrial accident and the injury in question." *Id.* In upholding the Commission's decision, this court explained that "the medical panel is to give the Commission the benefit of its diagnosis relating to those matters that are particularly within the scope of its expertise." *Id.* at 845 (citation and internal quotation marks omitted). In contrast, we instructed that the Commission retains the "final responsibility of making the

decision as to the issues" in the administrative proceeding and "the medical panel may not take over this responsibility." *Id.* (citation and internal quotation marks omitted). We reasoned that whether the question to the panel incorporates the correct standard of legal causation is inconsequential because once the panel opines on the medical relationship between the two events, it is for the Commission to determine whether the recent injuries are the natural result of the prior industrial accident.[17] *Id*. That "narrower issue of legal causation" is properly determined by the ALJ through "an analysis of the facts surrounding the subsequent injury and analysis of the connection between the subsequent injury and the original compensable industrial injury." *Id*. at 846.

¶43     In the present case, both the ALJ and the Commission relied on the conclusion of each of the medical experts that the prior workplace accident contributed to some extent to Mr. Brown's 2007 injuries. The ALJ then considered the facts surrounding the subsequent injury and the connection between that injury and the prior workplace accident. For example, the ALJ considered whether the leap onto Mr. Brown's back was so causally significant that it negated the impact of the prior workplace accident. In doing so, the ALJ gave Dr. Knoebel's amended report "very little evidentiary weight," both because his attempt to incorporate legal conclusions into his opinion "overstep[ped] his boundary of expertise" and because even Dr. Knoebel acknowledged that the prior back surgery had left Mr. Brown with "residual L4–5 disc extrusion already narrowing the right neural fragment." We agree that Dr. Knoebel's attempt to offer a legal opinion on whether the 2007 injuries were the natural result of the 2003 accident intruded into the purview of the ALJ and the Commission. *See id.* at 845.

---

17. We also reasoned that even if "*McKean* requires more of a causal connection than the phraseology of the inquiry to the medical panel may suggest," the panel's assessment that the back surgery was 70% the result of the prior industrial accident dispelled any concern about the significance of the medical connection. *Intermountain Health Care, Inc. v. Board of Review of the Indus. Comm'n*, 839 P.2d 841, 846 (Utah Ct. App. 1992).

Both the ALJ and the Commission combined the medical causation information provided by the experts—including Dr. Knoebel's opinion that the 2003 accident was a "very minor contributing cause"—with an examination of the facts and circumstances to arrive at the conclusion that Mr. Brown had proved by a preponderance of the evidence that the 2007 injuries were the natural result of the prior industrial accident and his resultant L4–5 damage.

¶44   The Commission was correct in determining that the present facts fall within the natural result legal standard. Despite noninvasive techniques and surgery, Mr. Brown continued to complain of lower back pain during the years after the workplace accident. Indeed, only five months before the 2007 festival incident, an MRI revealed both left-sided and right-sided abnormalities at the L4–5 region of Mr. Brown's spine. Dr. Knoebel agreed that the 2007 MRI, taken before the festival incident, showed lingering damage to both sides of the L4–5 region of Mr. Brown's back. Similarly, Dr. Snook, Dr. Kabins, and Dr. Knoebel all concluded that the 2003 accident was a contributing cause of the injuries he suffered when the third party jumped on him in 2007. Finally, there was no evidence that Mr. Brown would have suffered the same injuries in 2007 if he had not injured the same region of his back in the 2003 industrial accident. Accordingly, the Commission was correct in concluding that Mr. Brown is entitled to additional benefits pursuant to the Act under the natural result causation standard.

CONCLUSION

¶45   The School District failed to preserve its argument that, in this case, the Commission should have applied the causation standard mandated by *Allen v. Industrial Commission*, 729 P.2d 15 (Utah 1986). Likewise, we accept the Commission's factual findings because the School District failed to challenge them properly. There is substantial evidence in the record as a whole to support the ALJ's finding that there was no conflict among the physicians concerning medical causation and, therefore, the Commission's decision that

the ALJ was not required to submit the case to a medical panel does not exceed the bounds of reason and rationality. Finally, the Commission correctly applied the Act to the facts of this case to reach its conclusion that Mr. Brown's 2007 injuries were a natural result of the 2003 compensable workplace injury. For these reasons, we decline to disturb the Commission's decision.

———————